## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ERIKA CORDOVA,

                              Plaintiff,                    Case No. 23-1233-DDC

v.

TEXTRON AVIATION, INC.,

                              Defendant.

## <u>MEMORANDUM AND ORDER</u>

Workplace dynamics often prove difficult to navigate. Sometimes that difficulty arises from a general lack of civility, isolated instances of uncouth behavior, or a simple misunderstanding. Other times unlawful discrimination, retaliation, or harassment are to blame. This is a case of the former, not the latter.

Plaintiff Erika Cordova alleges defendant Textron Aviation, Inc.—her employer—is liable for her coworkers and supervisor's allegedly unlawful treatment of her. She brings claims for sex, race, and national origin-based discrimination, harassment, and retaliation under Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e) and 42 U.S.C. § 1981. But the discrete actions plaintiff alleges don't satisfy the standard for adversity required to support a discrimination or retaliation claim. And even if they did, the summary judgment facts fall short of establishing an inference of discrimination or a causal connection. And so, no reasonable jury could find plaintiff's adduced evidence clears the discrimination or retaliation prima facie hurdle.

Defendant also moves for summary judgment against plaintiff's coworker and supervisor harassment claims. In the context of coworker harassment—to hold a defendant employer

liable—plaintiff must adduce evidence capable of demonstrating that defendant was negligent in its response. Defendant investigated both alleged coworker harassment incidents. And, in response to one of them, defendant engaged in a conversation to reiterate workplace professionalism standards with all involved parties. No reasonable jury could find defendant's response negligent. But let's say it could. These actions—even when taken together—still don't rise to the level of severity or pervasiveness required to support a harassment claim.

Plaintiff also alleges supervisor harassment. But, as with the coworker harassment claim, no reasonable jury could find on the evidence plaintiff adduces that her supervisor's actions rise to the level of severity or pervasiveness required for a harassment claim. And so, this Order grants defendant's summary judgment motion against all of plaintiff's claims and closes the case.

The court explains its rulings, below, starting with the background information. Then, the court addresses plaintiff's discrimination and retaliation claims together. The court conducts an adversity analysis, followed by inference-of-discrimination and causal-connection analyses and holds that plaintiff's adduced evidence doesn't clear the prima facie hurdle for either claim. Finally, the court takes up plaintiff's harassment claims. It begins by explaining the different liability standards for coworker harassment versus supervisor harassment. After which, the court engages in a negligence analysis for plaintiff's coworker harassment claim and finishes with severity-or-pervasiveness analyses for both harassment claims. The court ends its work by reciting its conclusions.

## I.        Background

The following facts are stipulated, uncontroverted, or, where controverted, are stated in the light most favorable to plaintiff, the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

*Plaintiff's Employment*

Plaintiff began working for defendant's predecessor, Cessna Aircraft Company, in November 1997. Doc. 24 at 2 (Pretrial Order ¶ 2.a.i., Stipulations). Since July 2014, she has performed the tasks of an Assem Graphite 02, which involves the assembly, bond, and rework of graphite parts. *Id.* (Pretrial Order ¶ 2.a.ii., Stipulations). Plaintiff remains employed at Textron Aviation, Inc. when the parties' made their filings. Doc. 27-2 at 4 (White Aff. ¶ 11). At all times relevant to the allegations here, plaintiff's supervisor was Michael Moberg. *Id.* (Pretrial Order ¶ 2.a.iii.–iv., Stipulations).

### Moberg's Job Description

Moberg held the title of Value Stream Leader (VSL). *Id.* (Pretrial Order ¶ 2.a.iv., Stipulations). A VSL must plan, organize, and control staffing costs; ensure timely production flow; and maintain or improve his team members' quality, safety, efficiency, and training. *Id.* (Pretrial Order ¶ 2.a.v., Stipulations); Doc. 27-1 at 1 (Def. Ex. 1) (reciting job description of VSL). Thus, a VSL's job involves monitoring his employees as they perform their duties to "make sure that people are working[.]" Doc. 27-3 at 8 (Cordova Dep. 50:3–9). And a VSL may realign assignments as needed to accomplish timely production operations. Doc. 27-2 at 2–3 (White Aff. ¶ 4). VSLs also must report anticipated completion dates for certain tasks to defendant's Production Control & Logistics (PC&L). Doc. 24 at 2 (Pretrial Order ¶ 2.a.vi., Stipulations). And so, Moberg "would ask employees the status of their work" so that he could "get an understanding of where orders were and what needed to be done to meet production deadlines." Doc. 27-4 at 3 (Moberg Aff. ¶ 6).

### Moberg's Supervisory Approach

Plaintiff alleges that Moberg supervised her more vigorously than others by excessive questioning and monitoring. Doc. 24 at 4 (Pretrial Order ¶ 3.a.). As for the excessive questioning, plaintiff acknowledges that VSLs must report completion dates. Doc. 27-3 at 4

(Cordova Dep. 27:8–25). But, plaintiff contends, Moberg nonetheless exceeded his VSL authority by taking an aggressive, over-zealous supervisory approach when ascertaining her completion dates. Doc. 32 at 1. Moberg inquired about her completion time repeatedly—every ten minutes—day after day. Doc. 32-3 at 4–5 (Cordova Dep. 59:20–61:8). Plus, he didn't bring a notebook or other device to record her updates during these repeated encounters. *Id.* To be sure, Moberg similarly questioned other employees as part of his job duties but, plaintiff asserts, not as frequently. *Id.* For example, he only asked the operator working in the same area with plaintiff—David Pearson—about his units in the morning. *Id.* at 5 (Cordova Dep. 61:3–13; 62:5–10).

Plaintiff also alleges that Moberg monitored her more closely than other supervisees. Doc. 24 at 4 (Pretrial Order ¶ 3.a.). Moberg supervised 30 to 35 operators at the same time. Doc. 27-3 at 11 (Cordova Dep. 63:1–3). Many of those operators worked far away from plaintiff, separated by 40–70 feet of distance, considerable noise pollution, and an obstructed view. *Id.* at 11–13 (Cordova Dep. 63:4–65:18). Plaintiff thus couldn't hear the conversations Moberg had with the other operators. *Id.* at 12 (Cordova Dep. 64:6–19). Nor did she observe Moberg throughout the day, since she mostly worked facing the wall. *Id.* at 15–16 (Cordova Dep. 72:24–73:3). But, plaintiff explains, "you can feel when somebody's watching you[.]" *Id.* at 16 (Cordova Dep. 72:24–73:6). And, when she'd turn, plaintiff would see Moberg "still standing in the same position watching[,]" making plaintiff "feel uncomfortable." *Id.* (Cordova Dep. 72:24–73:10). Plaintiff never received any discipline or verbal reprimand based on Moberg's observations. *Id.* at 17–18 (Cordova Dep. 74:23–75:10).

In addition to Moberg's allegedly excessive questioning and monitoring, plaintiff's claims rely on three other Moberg incidents: reassigning plaintiff's units to a trainee; delaying in

providing a workstation safety alternative to a wobbly, wooden stool; and making an inappropriate comment to plaintiff after measuring for that stool alternative. The court recites the background for these incidents, next.

### New Employee Training

In May 2022, defendant hired a new employee to work the sixth shift. Doc. 24 at 3 (Pretrial Order ¶ 2.a.x., Stipulations). Plaintiff helped train this new hire. *Id.* At the time, plaintiff worked the fifth shift. *Id.* She helped train the new employee on multiple occasions before he began working the sixth shift full-time. *Id.* On May 3, 2022, Moberg transferred a unit that plaintiff was working on to Connor Tong, the new employee. Doc. 32-3 at 13, 15 (Cordova Dep. 104:15–18, 109:2–3). Moberg explained to plaintiff that "the parts were hot" and moved plaintiff "to work on another job and gave . . . Tong her unit to finish up." *Id.* at 13 (Cordova Dep. 104:15–18). But, according to plaintiff, the part "wasn't priority," but instead was "regularly routing." *Id.* at 13–14 (Cordova Dep. 104:25–105:3). And Moberg didn't show plaintiff any supporting paperwork about the part's priority status. *Id.* at 14 (Cordova Dep. 105:3–5). Also, the priority designation appeared inaccurate because the part then "stayed there for a week after it was completed." *Id.* (Cordova Dep. 106:13–16). Moberg directed a similar transfer of units from plaintiff to Tong again on May 24, 2022, and May 26, 2022. *Id.* at 14–15 (Cordova Dep. 108:9–109:3).

According to plaintiff, Moberg's transfer of the units "targeted and discriminated against" her "by disrupting her work, interfering with her performance, and intimidating her to complete the task without reasonable cause." Doc. 24 at 7 (Pretrial Order ¶ 3.a.). Plaintiff also feared that shifting of units in this fashion would give Tong credit for finishing the part—not her and thus would hurt her hour totals. Doc. 32-3 at 14 (Cordova Dep. 106:21–24). Plaintiff never received any reprimand, punishment, or additional work hours as a result of this incident. *Id.* (Cordova

Dep. 106:21–107:18).  To be sure, plaintiff had been taken to HR previously for her "hours being low."  *Id.* (Cordova Dep. 107:15–108:5).  But plaintiff didn't receive "any formal discipline" from defendant—then, or at any time over the past five years.  Doc. 27-2 at 5 (White Aff. ¶ 15). And plaintiff has "never received any kind of verbal reprimand or negative evaluation from Moberg."  *Id.*

According to defendant's corporate representative, it "is not uncommon for experienced employees like [plaintiff] to be asked to train new employees."  *Id.* at 4 (White Aff. ¶ 11).  Other employees, "including male employees and employees of different races and national origins, were similarly asked to train Tong[.]"  Doc. 27-4 at 3 (Moberg Aff. ¶ 5).  And, when an employee helped with training, Moberg "look[ed] at the combined standard hours earned of the people working together to assess productivity."  *Id.* at 4 (Moberg Aff. ¶ 11).  He expected during such training periods that "employee efficiency would decrease[.]"  *Id.*

### *Requesting a Workplace Safety Solution*

In 2022, defendant made changes to plaintiff's work area by providing new platforms to stand on.  Doc. 24 at 2 (Pretrial Order ¶ 2.a.viii., Stipulations).  Those new platforms replaced wooden boxes that sometimes had served as stools.  *Id.*  Plaintiff previously had raised concerns to Moberg about the stability of the box she was using as a stool.  Doc. 27-4 at 2 (Moberg Aff. ¶ 3).  And plaintiff suggested a mat could go under the stool as a possible solution.  *Id.* According to plaintiff, Moberg shrugged and didn't respond verbally to her mat request.  Doc. 27-3 at 24 (Cordova Dep. 98:4–11).  Moberg declares that he considered the mat, but determined it was too soft and, thus, wouldn't provide enhanced stability.  Doc. 27-4 at 2 (Moberg Aff. ¶ 3). Instead, defendant sought assistance from an environmental health safety engineer to evaluate potential stool solutions.  *Id.*  As a result, plaintiff received multiple platforms.  *Id.*; Doc. 27-3 at 19–20 (Cordova Dep. 90:20–91:13) (plaintiff identifying three different platforms provided).

Defendant didn't discipline plaintiff in any way for requesting a mat.  Doc. 27-3 at 23–24
(Cordova Dep. 97:25–98:3).

### *Moberg's "Posing" Comment*

On April 27, 2022, just after measuring plaintiff's workstation to order a new platform,
Moberg allegedly made a statement about plaintiff standing on her wooden stool.  Doc. 32-3 at
12 (Cordova Dep. 98:17–100:4).  According to plaintiff, Moberg said, "Yes, I have seen
[plaintiff] almost slip from the box as she was posing.  She can pose on the stepstool even better
than before."  *Id.*  After that comment, Moberg allegedly winked at plaintiff.  *Id.*  Moberg denies
making the comment.  Doc. 27-2 at 3 (White Aff. ¶ 9).

Three other employees were present at the time of the alleged comment.  *Id.*  Defendant
subsequently interviewed all of them in its investigation.  *See* Doc. 32-4 at 4–15 (Pl. Ex. C).
Defendant concluded the comment allegations were unsubstantiated because "2 out of 3
witnesses did not see/hear anything concerning."  *Id.* at 5 (Pl. Ex. C).  Specifically, one witness
responded to a question asking whether anything "inappropriate" occurred at that measuring
session with, "[n]ot that I can recall."  *Id.* at 12 (Pl. Ex. C).  And when asked in particular about
the posing-on-a-box comment, she replied, "Noooo, either I wasn't paying attention or I didn't
hear that . . . . Doesn't stick out in my mind[.]  If I heard it I might remember[.]"  *Id.*  Another
witness likewise didn't recall Moberg making such a comment, responding:  "[He] [m]ay have
said step up on the stool. . . . I am pretty sensitive to that if anything would have been said, that
was deemed sexual harassment, I would remember and have noticed."  *Id.* at 13 (Pl. Ex. C).  A
third employee, though, confirmed plaintiff's version of the events in a written statement.  *Id.* at
17 (Pl. Ex. C).

### *Plaintiff's Coworker Complaints*

Along with the complaints against Moberg, plaintiff also lodged two complaints against coworkers that form part of her hostile work environment claim. *See* Doc. 24 at 4–5 (Pretrial Order ¶ 3.a.). *First*, on January 14, 2022, plaintiff reported an incident where coworker Lori Atwood pulled up plaintiff's personal information on Atwood's phone screen. Doc. 32-6 at 38 (Pl. Ex. E). Atwood showed her phone screen to plaintiff and asked "probing questions" about where plaintiff lives. *Id.* Then, Atwood asked if plaintiff knew that the state owes plaintiff money. *Id.*

Defendant investigated plaintiff's allegation about Atwood and compiled a summary of its findings. *Id.* at 23–24 (Pl. Ex. E) (showing defendant interviewed Atwood and plaintiff on January 26, 2022, Pearson on March 2, 2022, and wrote an investigation summary on March 4, 2022). Defendant interviewed plaintiff, Atwood, and coworker David Pearson in its investigation. *Id.* Defendant concluded plaintiff's complaint was "not substantiated." *Id.* at 24 (Pl. Ex. E). The investigation report explained that Atwood had located unclaimed property belonging to plaintiff on the Kansas State Treasury website. *Id.* The website is public information. Doc. 27-2 at 4 (White Aff. ¶ 12). In her interview, Atwood explained that she "just wanted [plaintiff] to be aware" that plaintiff had money listed on the website. Doc. 32-6 at 42 (Pl. Ex. E). Atwood also clarified that she "was just trying to be nice and let [plaintiff] know" because she "would want to know if it was [her]." *Id.* Plaintiff cited no subsequent incidents involving Atwood.

*Second*, plaintiff reported that a female coworker said "f*** you, bitch" to plaintiff. Doc. 27-2 at 4 (White Aff. ¶ 13). The incident happened when plaintiff passed two coworkers on the way back from the restroom. Doc. 32-3 at 7 (Cordova Dep. 79:8–21). The other coworker didn't say anything; she just laughed. *Id.* (Cordova Dep. 80:18–23). Defendant investigated but

couldn't substantiate plaintiff's allegation because the involved parties provided conflicting reports. Doc. 27-2 at 4 (White Aff. ¶ 13). Nonetheless, defendant had a "level set" conversation with plaintiff and the two coworkers. Doc. 24 at 2 (Pretrial Order ¶ 2.a.vii., Stipulations). The purpose of the conversation was "to set expectations for proper workplace conduct and standards of professionalism." Doc. 27-2 at 4 (White Aff. ¶ 13).

## II.        Summary Judgment Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1246 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond

adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144 F.3d at 671). Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Finally, since 1986, federal courts haven't viewed summary judgment as a "disfavored procedural shortcut[.]" *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.    *McDonnell Douglas* **Burden-Shifting Framework**

"A plaintiff can succeed under Title VII [and] § 1981 . . . by presenting direct and circumstantial evidence of discrimination or retaliation." *Bell v. City of Tulsa*, No. 23-5111, 2025 WL 86956, at *8 (10th Cir. Jan. 14, 2025). "When a plaintiff relies on only circumstantial evidence, as here, the *McDonnell Douglas* burden-shifting framework typically applies." *Id.; see*

10

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell Douglas*, a

plaintiff, *first*, must establish a prima facie case.  *See Bekkem v. Wilkie*, 915 F.3d 1258, 1267

(10th Cir. 2019) (citation omitted).  "The burden on the employee to establish a prima facie case

is light[.]"  *Guy v. McDonough*, No. 20-6158, 2021 WL 3854764, at *2 (10th Cir. Aug. 30,

2021).  *Second*, if plaintiff satisfies the obligations for a prima facie case, then the burden shifts

to defendant to produce "'a legitimate nondiscriminatory reason for its employment decision.'"

*Bekkem*, 915 F.3d at 1267 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

As with the employee's burden at the first step, the employer's burden at this second stage is

"exceedingly light."  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007) (internal

quotation marks omitted).  *Last*, the burden shifts back to the plaintiff "to show that there is a

genuine dispute of material fact whether the employer's proffered reason for the challenged

action is pretextual—*i.e.*, unworthy of belief."  *Bekkem*, 915 F.3d at 1267 (quotation cleaned up).

    The court applies this framework to plaintiff's claims here, starting with *McDonnell*

*Douglas*'s first prong:  the prima facie case.  Plaintiff's discrimination and retaliation claims

overlap.  So, the court describes each discrete act alleged.  Then, the court evaluates plaintiff's

prima facie case premised on that act, *first*, under a discrimination rubric and, *second*, under a

retaliation rubric.  The court begins by outlining the legal standards for a prima facie case of

discrimination and retaliation, below.

## IV.        Plaintiff's Prima Facie Case

### A.        Discrimination

    To make a prima facie case for discrimination, plaintiff must present "evidence that:  (1)

the victim belongs to a protected class; (2) the victim suffered an adverse employment action;

and (3) the challenged action took place under circumstances giving rise to an inference of

discrimination."  *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022)

11

(internal quotation marks and citation omitted).  Defendant doesn't dispute that plaintiff—a Hispanic woman of Mexican national origin—belongs to a protected class.  Doc 27 at 23.  But defendant argues that plaintiff fails to establish the second and third requirements for a prima facie case of discrimination:  that the alleged discriminatory actions constitute adverse employment actions and that the circumstances surrounding those actions give rise to an inference of discrimination.

### B.    Retaliation

The "failure of a discrimination claim is not necessarily fatal to a retaliation claim[,]" *Ford*, 45 F.4th at 1224, and so, the court analyzes each alleged discrete act separately under a retaliation rubric.

To state a prima facie retaliation claim, "'a plaintiff must show (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'"  *Bekkem*, 915 F.3d at 1267 (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012)).  The parties have stipulated that plaintiff previously submitted multiple discrimination complaints to KHRC.  Doc. 24 at 3 (Pretrial Order ¶ 2.a.xi., Stipulations) (citing four KHRC complaints prior to filing this case— KHRC 39415-17, KHRC 40371-19, KHRC 42721-21, KHRC 43906-23).  Concluding these submissions fulfill the first prima facie retaliation requirement, defendant challenges just the second and third prongs.  Defendant argues that plaintiff fails to adduce evidence sufficient to show any materially adverse action or the requisite causal connection.

### C.    Adverse Employment Action / Materially Adverse Action

The court begins with the first disputed prong—adverse action—analyzing discrimination and retaliation together.  The court evaluates each of plaintiff's claims, *first*, asking whether it

comports with an adverse employment action required for a prima facie case of discrimination and, *second*, asking whether it comports with a materially adverse action required for a prima facie case of retaliation. To do so, the court outlines at the outset the legal standards for an adverse employment action and a materially adverse action. Then the court addresses the discrete acts, one-by-one, under each standard. Start with discrimination and an adverse employment action.

### 1. Adverse Employment Action Legal Standard

Courts define the term adverse employment action "liberally," meaning that these actions "are not simply limited to monetary losses in the form of wages or benefits." *Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 604 (10th Cir. 2019) (internal quotation marks and citation omitted). "A strong indicator that a challenged employment action is adverse 'is that the action causes harm to future employment prospects.'" *Id.* at 605 (quoting *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004)). And, to qualify as adverse, an employment action generally must include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ford*, 45 F.4th at 1222 (internal quotation marks and citation omitted).

To be certain, the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, likely requires extraction of "significant" and "significantly" from *Ford*'s adverse definition. 601 U.S. 346, 355 (2024) ("To demand 'significance' is to add words—and significant words, as it were— to the statute Congress enacted. It is to impose a new requirement on a Title VII claimant, so that the law as applied demands something more of her than the law as written."); *see also Mirza v. UWorld, LLC*, No. 23-cv-02208-EFM, 2024 WL 4144203, at *5 (D. Kan. Sept. 11, 2024) ("[T]he Supreme Court effectively overruled the Tenth Circuit's interpretation that an adverse employment action must constitute a 'significant' change."). Nonetheless, *Muldrow* still requires

"*some* disadvantageous change in an employment term or condition" or "*some* harm respecting an identifiable term or condition of employment."  601 U.S. at 354–55 (emphases added) (internal quotation marks and citation omitted).[1]  And so—even without importing the significance requirement into the definition of adverse—"a mere inconvenience or an alteration of job responsibilities does not qualify."  *Ford*, 45 F.4th at 1222 (internal quotation marks and citation omitted).  That is, "[n]ot everything that makes an employee unhappy is an actionable adverse action."  *Braxton*, 769 F. App'x at 604 (internal citation and quotation marks omitted).

## 2.    Materially Adverse Action Legal Standard

The second prong of a prima facie case for Title VII retaliation requires a plaintiff to demonstrate "'that a reasonable employee would have found the challenged action materially

---

[1]    *Muldrow* decided a Title VII discrete discrimination claim, one premised on a specific job transfer.  601 U.S. at 354.  The Court held that a plaintiff asserting a Title VII discrimination claim "must show some harm respecting an identifiable term or condition of employment" but not "significant" harm.  *Id.* at 354–55.  The Tenth Circuit hasn't yet addressed, at least not head-on the breadth of *Muldrow*'s reach.  But our Circuit has applied *Muldrow* outside of the job transfer context.  *Bell*, 2025 WL 86956, at *7 (quoting *Muldrow*'s harm standard to conclude disciplinary-hearing notices weren't an adverse employment action in a wrongful suspension/termination context).

And other Circuits have acknowledged that *Muldrow* may affect the adverse employment action analysis more generally—that is, beyond the job transfer context.  *See, e.g.*, *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 885–86 (6th Cir. 2024) (acknowledging *Muldrow* may call the Sixth Circuit's precedent "into doubt" but saving "*Muldrow*'s effect on our caselaw for another day").  Our court and other district courts in our Circuit have applied *Muldrow* more broadly, consulting its more forgiving standard when analyzing an adverse employment action outside the job transfer context.  *See Harris v. Sec'y of U.S. Dep't of Veterans Affs.*, No. 22-CV-02489-HLT, 2024 WL 3010879, at *10 (D. Kan. June 14, 2024) ("No reasonable jury could conclude that the alleged multiple investigations were an adverse employment action, even under the more lenient standard of *Muldrow*."); *see also Smith v. McDonough*, No. CV 20-1321 KK/JFR, 2024 WL 2804428, at *8–10 (D.N.M. May 31, 2024) (completing sua sponte review of a previous Order's ruling on disparate treatment claims not involving a job transfer to account for *Muldrow*'s new standard).  The issues here don't require the court to decide the scope of *Muldrow* today, however.

Instead, the court accounts for a broad application that would alter the adverse standard as applied to this case.  After all, plaintiff here brings her discrimination claims, in part, under the same statutory provision at issue in *Muldrow*, 42 U.S.C. § 2000e-2(a)(1).  And *Muldrow* largely rests on a textual reading of that very provision, making application to this case likely.  And so, the court won't append the offending "significant" to the adverse standard here.

adverse[.]'" *Bekkem*, 915 F.3d at 1267 (quoting *Khalik*, 671 F.3d at 1193). The Supreme Court

has clarified that the "antiretaliation provision protects an individual not from all retaliation, but

from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*,

548 U.S. 53, 67 (2006). That is, a Title VII retaliation claim requires "an adverse employment

action . . . that would have 'dissuaded a reasonable worker from making or supporting a charge

of discrimination.'" *Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018) (quoting *Burlington

N.*, 548 U.S. at 68); *see Muldrow*, 601 U.S. at 357 (clarifying that the anti-retaliation context is

distinct from the anti-discrimination context so requiring "significant harm" for a materially

adverse action remains valid for reasons "peculiar to the retaliation context" (quotation cleaned

up)). "Requiring this level of adversity is necessary to separate significant from trivial harms,

petty slights, minor annoyances and simple lack of good manners[.]" *Johnson v. Weld County*,

594 F.3d 1202, 1216 (10th Cir. 2010) (quotation cleaned up). As the Supreme Court has

explained, Title VII "does not set forth 'a general civility code for the American workplace.'"

*Burlington N.*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75,

80 (1998)).

   The court now applies the adverse employment action standard and, in turn, the

materially adverse action standard to plaintiff's sex, race, and national origin discrimination

claims. The claims—in abbreviated form—include:

- Moberg constantly monitoring and repeatedly questioning plaintiff about her
    work, Doc. 24 at 4, 6–7;[2]

---

[2]    Plaintiff identifies Moberg's general practice of monitoring and questioning her, Doc. 24 at 4, as
well as a specific incident—on May 3, 2022—when he asked her when she would complete a particular
part, *id.* at 6–7. Plaintiff's deposition discussed the May 3 incident in the context of her allegations about
Moberg shifting her work to a new employee. *See* Doc. 32-3 at 13–14 (Cordova Dep. 104:9–105:9). The
court thus addresses it in a more fulsome fashion under the new employee training section. *See* § IV.C.4.
To the extent that the May 3, 2022, incident also informs plaintiff's discrimination and retaliation claims

- Moberg requiring plaintiff to train a new employee—and reassigning to the new hire some of plaintiff's duties—thus detrimentally affecting her productivity statistics, *Id.* at 7 (Pretrial Order ¶ 3.a.); and

- defendant's allegedly delayed response to plaintiff's workstation safety concerns. *Id.* at 5–6 (Pretrial Order ¶ 3.a.).

Mindful of the summary judgment standard—requiring the court to view the evidence and draw inferences in the light most favorable to the non-moving party—the court evaluates whether plaintiff has adduced evidence to substantiate that these claims qualify as adverse employment actions or materially adverse actions. Take Moberg's monitoring and questioning first.

### 3.    Monitoring and Questioning

Plaintiff testified that Moberg questioned her "constantly" about her completion times. Doc. 32-3 at 4–5 (Cordova Dep. 59:23–61:8). And she testified that he would "stand[] in the same position watching" her work. Doc. 27-3 at 16 (Cordova Dep. 73:7–8). Plaintiff concedes that Moberg's VSL job description encompassed monitoring and questioning duties. Doc. 32 at 1. But, she contends, Moberg exceeded his authority "by aggressively asking Plaintiff the same question repeatedly in a short period of time" without "supportive documentation from PC&L[.]"[3] *Id.* at 1–2. Such constant scrutiny, plaintiff alleges, "negatively impacted [her]

---

premised on monitoring and questioning, the court's analysis here applies with equal force to that specific incident.

[3]    In making this argument, plaintiff also alleges other details about Moberg's aggressive approach. Doc. 32 at 1. But plaintiff doesn't identify any evidentiary support for these other assertions in the summary judgment record. *See id.* at 1–2. For instance, she alleges that Moberg stood "within one foot" of plaintiff and used "an aggressive tone and facial expressions/body language." *Id.* at 1. For record support, she cites to her deposition testimony. *Id.* at 2 (citing Doc. 32-3 at 4–5 (Cordova Dep. 59:10–61:8)). But the designated testimony never mentions anything about Moberg's proximity to plaintiff, his tone, or his physical demeanor. "Offering 'conclusory allegations' or 'unsupported speculation' does not satisfy the nonmovant's burden at summary judgment." *Leonard v. HMG Park Manor of Salina, LLC*, No. 24-3009, 2025 WL 635752, at *5 (10th Cir. Feb. 27, 2025) (quoting *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1205 (10th Cir. 2022)). Without any objective supporting evidence, the court doesn't

ability to perform her job[.]" *Id.* at 13. That's so, plaintiff explains, because Moberg's persistent observation made plaintiff "feel intimidated, humiliated, and uncomfortable." Doc. 24 at 4.

The court now addresses whether plaintiff has adduced sufficient evidence for a reasonable jury to find that Moberg's monitoring/questioning qualify, *first*, as an adverse employment action or, *second*, as a materially adverse action.

### a. Moberg's Monitoring and Questioning Don't Qualify as Adverse Employment Actions

Recall that *Muldrow* requires "some disadvantageous change in an employment term or condition" or "some harm respecting an identifiable term or condition of employment." 601 U.S. at 354–55 (internal quotation marks and citation omitted). Even when the court draws all inferences in the light most favorable to the plaintiff—thus concluding that Moberg monitored and questioned plaintiff overzealously—no "disadvantageous change" or "harm" ever manifests. *Id.* Plaintiff testified that no discipline or reprimand followed Moberg's observations. Doc. 27-3 at 17–18 (Cordova Dep. 74:23–75:10). And defendant's corporate representative confirmed as much. Doc. 27-2 at 5 (White Aff. ¶ 15) ("Cordova did not receive any kind of discipline related to Moberg's observation of her work, and she never received any kind of verbal reprimand or negative evaluation from Moberg."). Indeed, plaintiff hasn't received any formal discipline from defendant in the past five years. *Id.*

Plaintiff never identifies any other harm to her employment terms or conditions. To be sure, she invokes her own feelings of discomfort. But feelings alone can't provide the requisite harm to support an adverse employment action. *Braxton*, 769 F. App'x at 605 (explaining that

---

consider these other aggravating details. *See In re Grandote Country Club Co.*, 252 F.3d 1146, 1149 (10th Cir. 2001) ("The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence to support a party's factual claims. Unsupported conclusory allegations thus do not create a genuine issue of fact.").

"feelings of humiliation alone are not enough to establish an adverse employment action").

What's more, other courts have found—at the summary judgment stage—that monitoring and

recording an employee's work didn't "constitute[] a disadvantageous change in an employment

term or condition." *Harris*, 2024 WL 3010879, at *10 (concluding no reasonable jury could find

an adverse employment action where plaintiff's supervisor required his secretary to monitor

plaintiff's work and record completion of assigned tasks and attendance). Plaintiff thus hasn't

adduced evidence that would allow a reasonable jury to find an adverse employment action

premised on Moberg's monitoring and questioning plaintiff.

> **b.    Moberg's Monitoring and Questioning Don't Qualify as Materially Adverse Actions**

Nor does the summary judgment evidence permit a reasonable jury to find that Moberg's

actions constitute a materially adverse action, as required for a retaliation claim. The Seventh

Circuit has considered the question whether monitoring an employee at work would dissuade a

reasonable employee from engaging in protected activity. *Lewis v. Wilkie*, 909 F.3d 858 (7th

Cir. 2018). In *Lewis*, plaintiff's supervisor instructed plaintiff's coworkers to monitor plaintiff's

whereabouts during work. *Id.* at 864. The Seventh Circuit affirmed the district court's finding

that this monitoring didn't constitute a materially adverse action. *Id.* at 868. It noted, *first*, the

lack of evidence to substantiate the alleged monitoring. *Id.* at 869. *Then* it concluded: "[E]ven

if this monitoring did occur, there is no evidence it caused Lewis harm or injury. He was not

disciplined in connection with the alleged monitoring. The knowledge that supervisors are

monitoring one's location while at work would not dissuade a reasonable employee from

engaging in protected activity." *Id.*

When the Tenth Circuit took up the question of monitoring in the retaliation context, it

likewise looked beyond the monitoring itself to discern whether suffering followed from the

monitoring. *Tapia v. City of Albuquerque*, 170 F. App'x 529, 534 (10th Cir. 2006). Finding no

suffering, the Tenth Circuit also found no materially adverse action and thus affirmed the district

court's grant of summary judgment to defendant. *Id.*; *see also Keller v. Crown Cork & Seal

USA, Inc.*, 491 F. App'x 908, 914 (10th Cir. 2012) ("[S]trict application of policies, increased

supervision, write-ups, means and methods of communication with her supervisors," do not rise

to materially adverse actions sufficient to support retaliation because they "are in the nature of

ordinary workplace tribulations."). Another case decided by our court also has concluded

similarly. *See Harris*, 2024 WL 3010879, at *11 ("There is no evidence suggesting that having

one's . . . work recorded . . . rises to the level of an action that a reasonable employee would

consider materially adverse.").

Here, plaintiff alleges simply that Moberg's "constant scrutiny" "negatively impacted

[her] ability to perform her job[.]" Doc. 32 at 13. The only specific harm plaintiff ever cites

from this scrutiny is feeling "intimidated, humiliated, and uncomfortable." Doc. 24 at 4. But a

slew of courts have held that even management interactions that are "intimidating" don't qualify

as materially adverse actions. *See Turrentine v. United Parcel Serv., Inc.*, 645 F. Supp. 2d 976,

991 (D. Kan. 2009) (collecting cases); *see also Cain v. Locke*, 483 F. App'x 276, 281 (7th Cir.

2012) ("What this evidence shows is that her employer expected [plaintiff] to do her job, and the

fact that her supervisors may have been rude or intimidating does not elevate these incidents to

the level of materially adverse actions."); *Ahern v. Shinseki*, No. 05-117-ML, 2009 WL 1615402,

at *6 (D.R.I. June 9, 2009) (finding no materially adverse action even when supervisor "berated"

plaintiff "about her job performance" at multiple forced meetings), *aff'd,* 629 F.3d 49 (1st Cir.

2010); *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) ("[T]he intimidation that

[plaintiff] allegedly suffered, which he summarily describes as being stared and yelled at . . . is

not an actionable harm."). Nor do feelings of humiliation or discomfort clear the materially adverse hurdle. *See Nelson v. DeJoy*, No. 23-1227, 2024 WL 3507723, at *5 (10th Cir. July 23, 2024) ("We therefore agree with the district court that [the manager's] conduct, though inappropriate and offensive, did not result in an adverse employment action involving [plaintiff]."); *see also Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 787 (8th Cir. 2007) (finding no materially adverse action to support retaliation even though meeting with supervisors was "undoubtedly uncomfortable" for plaintiff), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *Bell v. EPA*, 232 F.3d 546, 554 (7th Cir. 2000) (affirming district court granting summary judgment against retaliation claims involving "demeaning assignments" and "verbal abuse").

In sum, plaintiff adduces no evidence of harm or injury following from Moberg's monitoring and questioning that would dissuade "'a reasonable worker from making or supporting a charge of discrimination.'" *Lincoln*, 880 F.3d at 540 (quoting *Burlington N.*, 548 U.S. at 68). No discipline or reprimand ensued. Doc. 27-2 at 5 (White Aff. ¶ 15); Doc. 27-3 at 17–18 (Cordova Dep. 74:23–75:10). And monitoring alone—without attendant suffering— doesn't qualify as a materially adverse action. *Tapia*, 170 F. App'x at 534. Nor do feelings of intimidation, humiliation, or discomfort propel plaintiff's claim over the materially adverse hurdle. Plaintiff thus has failed to adduce sufficient evidence that Moberg's monitoring and questioning constitute a materially adverse action.

The court turns next to plaintiff's next claim sounding in discrimination and retaliation— defendant requiring plaintiff to train a new employee.

### 4.    New Employee Training

Plaintiff also alleges that defendant "subjected" her "to discrimination, harassment, and retaliation through removal of her work duties" by Moberg. Doc. 24 at 7 (Pretrial Order ¶ 3.a.).

Plaintiff identifies three specific dates—May 3, May 24, and May 26, 2022—when Moberg assigned plaintiff's work duties to newly hired employee, Conner Tong. Doc. 32-3 at 13, 14–15 (Cordova Dep. 104:9–25; 108:9–109:3). At that time, plaintiff was helping to train Tong until he began full-time work on another shift. Doc. 24 at 3 (Pretrial Order ¶ 2.a.x., Stipulations). Plaintiff worried that this re-assignment of her units to Tong negatively affected her productivity measures. Doc. 32-3 at 14 (Cordova Dep. 106:17–24). And she feared a reprimand, like ones she had received before because her hours were too low. *Id.* (Cordova Dep. 107:15–108:5).

But plaintiff confirms she didn't receive "any kind of talking to" for not finishing the units reassigned to Tong. *Id.* (Cordova Dep. 107:15–108:8). Indeed, plaintiff hasn't received "any formal discipline" from defendant in the past five years. Doc. 27-2 at 5 (White Aff. ¶ 15). Nor has plaintiff ever received "any kind of verbal reprimand or negative evaluation from Moberg." *Id.* Plaintiff asserted that the person who finalized the unit got sole credit, driving her concern that her hours might suffer from these reassignments. Doc. 32-3 at 14 (Cordova Dep. 106:17–24). But Moberg attested that when employees trained a new hire, he "would look to the combined standard hours earned of the people working together to assess productivity." Doc. 27-4 at 4 (Moberg Aff. ¶ 11). He anticipated that "employee efficiency would decrease when an employee assisted with training[.]" *Id.*

The court addresses this employee training claim, below, evaluating it, *first*, under the adverse employment action standard and, *second*, under the materially adverse action standard.

        a.      **Plaintiff's reassigned units and decreased productivity don't constitute an adverse employment action.**

As outlined before, the adverse employment action standard requires "some disadvantageous change in an employment term or condition" or "some harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 354–55 (internal quotation

marks and citation omitted). Plaintiff hasn't come forward with sufficient evidence to create a genuine issue of material fact about any such change or harm flowing from her decreased productivity while training Tong. To be sure, plaintiff feared a reprimand for her reduced hours during training. Doc. 32-3 at 14 (Cordova Dep. 107:15–108:5). And plaintiff had received low-hour-based reprimands before, *id.*—though it's not clear that those reprimands came during a training period. Still, no reprimand followed her lowered hours after training Tong. *Id.* And defendant, for its part, asserts that no such reprimand ever would follow such training because Moberg accounted for any decreased efficiency that necessarily accompanied training periods. But even drawing all inferences to favor plaintiff, the non-movant, and assuming a reprimand could have followed, that hypothetical reprimand wouldn't qualify as an adverse employment action. *Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir. 2005) ("A reprimand . . . will only constitute an adverse employment action if it adversely affects the terms and conditions of the plaintiff's employment—for example, if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities."). Here, plaintiff merely feared a reprimand—she never adduces evidence that one followed. And even if she had, plaintiff still would have had to show the reprimand affected her terms and conditions of employment. Fear of a reprimand from decreased productivity attributable to training thus doesn't qualify as an adverse employment action.

Plaintiff's Response also suggests—albeit in conclusory fashion—that re-assignment of her units to Tong "negatively impacted [her] ability to perform her job[.]" Doc. 32 at 13. But she adduces no evidence of her hampered ability. Nor does she expound at all on the specific ways her performance allegedly declined. *See id.* at 13–14. She simply claims the training (and

presumably fear of reprimand) had a negative impact.  Such a conclusory allegation doesn't

suffice to survive summary judgment.  *GeoMetWatch*, 38 F.4th at 1200 ("'Unsubstantiated

allegations carry no probative weight in summary judgment proceedings.'" (quoting *Hasan v.

AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019))); *Pasternak v. Lear Petroleum Expl.,

Inc.*, 790 F.2d 828, 834 (10th Cir. 1986) ("Conclusory allegations, general denials, or mere

argument of an opposing party's case cannot be utilized to avoid summary judgment.").

And so, without having adduced evidence to support any disadvantageous change or

harm to an employment term or condition, no reasonable jury could find an adverse employment

action premised on plaintiff training Tong.

> **b.    Plaintiff's reassigned units and decreased productivity don't constitute a materially adverse action.**

Nor did plaintiff's training requirements—and any decline in productivity that

followed—constitute a materially adverse action to support plaintiff's retaliation claim.  Recall

that for action to qualify as materially adverse, the action must be one that "would have

'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

*Lincoln*, 880 F.3d at 540 (quoting *Burlington N.*, 548 U.S. at 68).

Here, plaintiff adduces no evidence that a written or oral reprimand followed her alleged

decline in productivity, though plaintiff feared it might.  Indeed, she hasn't received any

discipline in years, not even a verbal reprimand or negative evaluation from Moberg.  Doc. 27-2

at 5 (White Aff. ¶ 15).  And even if her fears had materialized, a reprimand alone still doesn't

qualify as a materially adverse employment action under Tenth Circuit case law unless more

follows.  *See Sartin v. Okla. Dep't of Hum. Servs.*, No. 15-CV-686-TCK-TLW, 2017 WL

3033130, at *3 (N.D. Okla. July 17, 2017) (collecting cases) ("Under Tenth Circuit case law in

the Title VII . . . retaliation context[], written letters of warning or reprimands are generally not

deemed materially adverse employment actions where the record evidence establishes that the employee remains employed and/or that the reprimand has not adversely affected her in any manner.").  Indeed, the Tenth Circuit has found even more formal reprimands—accompanied by threats of future discipline—don't rise to the requisite level of adversity.  *See, e.g.*, *Rennard v. Woodworker's Supply, Inc.*, 101 F. App'x 296, 307 (10th Cir. 2004) (concluding insufficient evidence to establish written reprimand was adverse when plaintiff "made no showing that the reprimand had any immediate or practical effect on her job status.").

Here, plaintiff remains employed.  Doc. 27-2 at 4 (White Aff. ¶ 11).  And she adduces no evidence that the feared reprimand would have had "any immediate or practical effect on her job status."  *Rennard*, 101 F. App'x at 307.  So, nothing here would dissuade a reasonable worker from reporting discrimination.  Thus, plaintiff hasn't created a triable issue that training Tong— and the accompanying reassignments—constituted a materially adverse employment action. Next, the court takes up plaintiff's final claim in the discrimination and retaliation context: failure to provide an ergonomic solution speedily.

### 5.    Workstation Safety

Finally, plaintiff contends Moberg "denied" her request for a mat in March 2022 when she expressed concern over the instability of the wooden stool she used in her workstation.  Doc. 24 at 5 (Pretrial Order ¶ 3.a.).  To demonstrate Moberg's denial, she cites his shoulder-shrugging response to her request.  *Id.*  And she asserts that Moberg provided a wobbly-stool solution only after plaintiff injured her finger on April 20, 2022.  *Id.*  She wouldn't have received a platform or mat, she avers, without the injury.  *Id.* at 6 (Pretrial Order ¶ 3.a.).  Plaintiff describes how the injury occurred:  she was using a drill and the "bit got stuck in the stop block, during the removal it slipped and hit her left index finger causing a laceration[.]"  *Id.* at 5 (Pretrial Order ¶ 3.a.).  But plaintiff never cites the summary judgment record as support.  In her Response to defendant's

motion, plaintiff asserts that "she was injured as a result of the defective stool she had been using." Doc. 32 at 14–15. She provides a cite to her deposition in support. *Id.* at 15 (citing SOF ¶ 14). But the cited deposition testimony merely explains that Moberg shrugged in response. It doesn't refer at all to an injured finger or indicate that the wobbly stool caused this injury. *See Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000) ("The district court was not obligated to comb the record in order to make [plaintiff's] arguments for [her].").

Even drawing all inferences to favor plaintiff, no reasonable jury could find Moberg *denied* plaintiff a workstation safety solution. To be sure, he never provided her with a mat. But he explained that the mat wouldn't have solved the stool's stability problem because it was soft. Doc. 27-4 at 2 (Moberg Aff. ¶ 3). And plaintiff never disputes the mat's softness or argues for its workability. Instead, Moberg arranged for platforms to address plaintiff's stool-stability concerns. *Id.* So, under the summary judgment facts here, one can infer that Moberg *delayed* in responding to plaintiff's request for a stability solution; he didn't outright deny it. And so, the question becomes: was Moberg's *delay* sufficient to support an adverse employment action or materially adverse action? As before, the court applies the adverse employment action standard first.

### a.    Moberg's alleged delay in providing a safety solution doesn't constitute an adverse employment action.

"Mere delay, without more, is not enough to establish an adverse employment action." *West v. N.M. Tax'n & Revenue Dep't*, 757 F. Supp. 2d 1065, 1098 (D.N.M. 2010) (citing *Tapia*, 170 F. App'x at 535). In *Amro v. Boeing Co.*, the Tenth Circuit addressed the question of delay in the discrimination context. 232 F.3d 790, 797 (10th Cir. 2000). Plaintiff there argued that "the delay in accomplishing his transfer [to another job position] was actionable discrimination." *Id.* But our Circuit concluded that his claim failed "for the simple reason that he cannot

demonstrate that the delay amounted to any adverse employment action by Boeing." *Id.*
Important to the Circuit's analysis was that plaintiff, although delayed several months, "did
ultimately transfer[.]" *Id.*  The Circuit concluded it was aware of no case "which holds that the
mere delay in obtaining a desired transfer, in the absence of some other negative or unfavorable
effect from that delay, constitutes an adverse employment action." *Id.*

Here the issue isn't a delayed transfer.  Instead, it's an employer delay in providing a
safety solution.  Nonetheless, the same principle holds.  The delay in decision-making—by
itself—doesn't constitute an adverse employment action.  *West*, 757 F. Supp. 2d at 1098.  And,
like the transfer in *Amro*, plaintiff here received her requested solution within months of her
request.  Plaintiff adduces no evidence of "some other negative or unfavorable effect [resulting]
from that delay." 232 F.3d at 797.  The court recognizes that plaintiff injured her finger.  But
plaintiff never cites any record evidence tying that injury to the stool or its allegedly delayed
replacement.  *See GeoMetWatch*, 38 F.4th at 1200 ("'Unsubstantiated allegations carry no
probative weight in summary judgment proceedings.'" (quoting *Hasan*, 935 F.3d at 1098)).  And
so, the court concludes, taking all reasonable inferences in plaintiff's favor, that her
discrimination claim rests on delay alone.  And delay alone isn't enough for an adverse
employment action.  *West*, 757 F. Supp. 2d at 1098.  It also isn't enough to qualify as a
materially adverse action, as the court explains, next.

### b.    Moberg's alleged delay in providing a safety solution doesn't constitute a materially adverse action.

In the retaliation context, the Tenth Circuit addressed the intersection of delay and
materially adverse actions in *Tapia*.  170 F. App'x 529.  There, plaintiff argued that his employer
had delayed in transferring him to another job because he filed an EEOC complaint and "made
other informal complaints."  *Id.* at 535.  Plaintiff contended that the delay "resulted in a

deterioration of his health and caused him to be 'humiliated and damaged.'" *Id.* But the Circuit held that no materially adverse action had occurred—despite plaintiff's alleged health decline and emotional difficulties. *Id.* In so concluding, the Circuit noted the employer ultimately approved the transfer, thus drawing a distinction between delay and outright denial. *Id.*

Again, the employer's delay here came in a different context—responding to a safety complaint instead of a job transfer request. But the delay versus denial distinction still inheres. Plaintiff received a workstation safety solution—in fact, she received three. Doc. 27-3 at 19–20 (Cordova Dep. 90:20–91:13) (identifying three different platforms defendant provided to plaintiff). And she doesn't identify any evidence supporting she sustained injury because of the dealy. Even if she had, it likely wouldn't suffice. Recall that the plaintiff in *Tapia* identified physical and mental health harms resulting from a job transfer delay. Still, the Circuit affirmed the district court's conclusion that he hadn't presented a prima facie case of retaliation because delay didn't constitute a materially adverse action. So, imagine the court here could infer somehow—and, to reiterate, nothing supports such an inference—that plaintiff's finger injury followed from the wobbly stool. Under *Tapia*, personal injury to health or mental well-being doesn't metamorphize delay into a materially adverse action. So, plaintiff hasn't presented evidence sufficient to sustain a prima facie retaliation claim premised on delay—and no reasonable jury could find otherwise.

To recap, plaintiff identifies three discrete actions as the bases for her discrimination and retaliation claims, whether under Title VII or § 1981. But all three—Moberg's monitoring/questioning, Moberg's reassignment of plaintiff's units during training, and Moberg's delay in providing a safety solution—don't survive the adverse action prong of a prima facie case.

But let's imagine they did. Plaintiff still has failed to present a triable issue on the next element of a prima facie discrimination or retaliation case: inference of discrimination or a causal connection, respectively. The court explains these causation shortcomings, next, starting with the requisite inference of discrimination for a prima facie discrimination case.

### D.    Inference of Discrimination / Causal Connection

#### 1.    Inference of Discrimination

Even if the court concluded a reasonable jury could find Moberg's acts adverse, the adverse action must take place "under circumstances giving rise to an inference of discrimination" to support a prima facie case. *Ford*, 45 F.4th at 1215 (internal quotation marks and citation omitted). A plaintiff may rely on a similarly situated employee comparison to raise an inference of discrimination. *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005). But courts shouldn't "mistake[]" proof of a similarly situated employee "as an indispensable element of the prima facie case." *Id.* Only when a plaintiff uses the similarly situated employee method to raise an inference of discrimination is a claim properly analyzed only in those terms. *Id.* at 1173–74.

As an alternative, a plaintiff may provide other "'sufficient objective evidence'" that allows a jury to infer discriminatory intent. *Ford*, 45 F.4th at 1224 (quoting *Wheeler v. BNSF Ry. Co.*, 418 F. App'x 738, 751 (10th Cir. 2011)). A plaintiff may point, for example, to actions or remarks that may reflect a discriminatory animus or to preferential treatment of employees outside the protected class. *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). Finally, a plaintiff's "personal belief is insufficient to create an issue of material fact." *Ford*, 45 F.4th at 1222. "Unsupported assertions or subjective belief of discrimination carry no probative weight . . . and are insufficient to preclude the grant of summary judgment." *Womack v. Unified*

*Gov't of Wyandotte Cnty. / Kan. City*, No. CV 19-2446-KHV, 2021 WL 4356085, at *10 (D.

Kan. Sept. 24, 2021) (citing *Tapia*, 170 F. App'x at 533).

> **a.     Moberg's allegedly overzealous questioning and monitoring of plaintiff don't raise an inference of discrimination.**

Plaintiff invokes the similarly-situated-employee method trying to establish that

Moberg's monitoring and questioning of her raises an inference of discrimination. Doc. 32 at 14.

Aiming to support this theory based on evidence in the summary judgment record, plaintiff relies

exclusively on her own deposition testimony and her own report to defendant.[4]  *See id.* at 2, 7, 11

(paragraphs 7–11, 23 and 40 cite only to plaintiff's deposition, paragraph 24 cites to plaintiff's

deposition and to Textron Hotline Report 10427).  Plaintiff's cited deposition testimony asserts

that Moberg "singled [her] out as to other operators[,]" who Moberg would question only in the

morning or in the evening.  Doc. 32-3 at 5 (Cordova Dep. 61:3–8).  And plaintiff testified that

Moberg would ask David Pearson—who worked in the same area as her—about his units

"just . . . in the morning."  *Id.* (Cordova Dep. 61:9–13, 62:5–25).  Plaintiff also cites a hotline

report.  Doc. 32-5 at 3 (Pl. Ex. D).  But that report simply recorded her own allegations about

Moberg.  *Id.* ("Michael [Moberg] has been treating [plaintiff] differently, as keeping close eye on

her, and check her hours daily, or yells at her when there is an hour mistake.").  Indeed, the

report clarifies that it's plaintiff making the report through the hotline, not another party.  *See id.*

("Erika [plaintiff] made the report through the Textron Helpline about Michael[] [Moberg's]

---

[4]     Plaintiff also cites occasionally to the Pretrial Order (Doc. 24).  Some of those citations are indecipherable.  *See, e.g.*, Doc. 32 at 2 (citing Doc. 24 at 4:13–15).  The others draw—not from the parties' stipulations—but from plaintiff's own factual contentions section of the Pretrial Order, which doesn't include any cites to the record.  *See id.* (citing Doc. 24 at 7–8).  So, in ascertaining how plaintiff uses the summary judgment evidence to support her Response, the court doesn't consider plaintiff's Pretrial Order citations as ones citing to the summary judgment record.  The case law is clear.  Citing factual contentions and allegations won't discharge the non-movant's summary judgment burden.

behavior."). And the report memorializes plaintiff's words, nothing more. *See generally id.* Although this report identifies coworker David Pearson as a person who "was aware of the problem[,]" *id.* at 3, plaintiff provides no substantiating evidence from Pearson to support her contention about Moberg's overzealous monitoring and questioning.[5]

Plaintiff's reliance strictly on her own statements "without any other supporting evidence . . . is insufficient to create an issue of material fact." *Ford*, 45 F.4th at 1223–24. A plaintiff instead must include "'sufficient objective evidence'" and not simply reference "'her own deposition transcript'" or self-serving report. *Id.* at 1224 (emphasis omitted) (quoting *Wheeler*, 418 F. App'x at 751). If this over-reliance wasn't problem enough, plaintiff's deposition also falters as competent summary judgment evidence of Moberg's interactions with other employees.

Plaintiff contends that she "relies on the visible and audible observations near her work area and other employees in that area" to support Moberg's overzealous monitoring and questioning of her in comparison to others similarly situated. Doc. 32 at 2–3. But her deposition testimony boxes her out: plaintiff acknowledges that she faced the wall for most of her workday, thus unable to observe Moberg's interactions with others. Doc. 27-3 at 15–16 (Cordova Dep. 72:24–73:3). She also concedes that she and David Pearson were "far away" from the other 30–35 other operators that Moberg supervised on a given shift, at a distance of anywhere from 40–70 feet. *Id.* at 11–12 (Cordova Dep. 63:1–64:5). And, as a result of that distance, plaintiff concedes she couldn't hear conversations Moberg had with other operators—except Pearson. *Id.*

---

[5]    The summary judgment record includes a letter written by David Pearson. Doc. 32-4 at 17 (Pl. Ex. C). But that letter never discusses Moberg's monitoring or questioning. Instead, it solely focuses on Moberg's alleged "posing" comment, which plaintiff invokes to support her hostile work environment claim. *See id.* In short, the letter provides no record evidence of plaintiff's overzealous monitoring and questioning theory.

at 12 (Cordova Dep. 64:1–16).  Plaintiff's own testimony thus undermines her explicit reliance

on "visible and audible observations near her work area."  Doc. 32 at 2–3. [6]  To be sure, plaintiff

still could observe David Pearson, who worked near her.  Doc. 32-3 at 5 (Cordova Dep. 61:9–

62:4).  And she "noticed" that Moberg didn't scrutinize Pearson, "a Caucasian male," as closely.

Doc. 32 at 11 (citing Doc. 32-3 at 5 (Cordova Dep. 62:5–10)).  But, yet again, she provides no

evidence beyond her own statements that Moberg pestered her more than Pearson.

The court must draw inferences in the light most favorable to the non-moving party,

*Nahno-Lopez*, 625 F.3d at 1283, but it needn't "adopt one party's version of the facts if the

record doesn't support it," *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1173 (10th Cir. 2017)

(separate opinion of Phillips, J.).  Plaintiff possibly felt "singled out" from the other operators.

Doc. 32 at 8.  "But her personal belief is insufficient to create an issue of material fact."  *Ford*,

45 F.4th at 1222 ("Plaintiff's subjective belief of discrimination was insufficient to preclude

summary judgment." (quotation cleaned up)).  Plaintiff thus doesn't adduce evidence sufficient

to demonstrate the requisite inference of discrimination for Moberg's allegedly overzealous

questioning and monitoring of plaintiff.  And plaintiff's prima facie case for sexual, racial, or

national origin discrimination fails on this inference-of-discrimination prong, as well.  Plaintiff's

---

[6]    The court remains cognizant of its role at summary judgment.  It mustn't weigh the credibility of witness testimony or otherwise evaluate competing evidence.  *See Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) ("It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment.").  But to "defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).  That is, "[u]nsupported statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence."  *Bourque v. Att'y Gen. of Okla.*, No. CIV-22-887-JD, 2023 WL 4013620, at *2 (W.D. Okla. Apr. 11, 2023), *report and recommendation adopted*, 2023 WL 4013335 (W.D. Okla. June 14, 2023).  Here, plaintiff's own testimony is inconsistent with her explicit reliance on her "visible and audible observations near her work area[.]"  Doc. 32 at 2–3.  Such an inconsistency suggests plaintiff's testimony about Moberg's interactions with similarly situated employees amounts to nothing more than "speculation, conjecture, or surmise" and is thus insufficient to "defeat a motion for summary judgment."  *Bones*, 366 F.3d at 875.

second discrete act—reassigning of units while training—fares no better on the inference-of-discrimination front.

        **b.**      **Moberg reassigning plaintiff's units while she trained a new hire doesn't raise an inference of discrimination.**

Plaintiff neglects to offer any argument about how Moberg's reassignment of units during Tong's training raises an inference of discrimination. *See* Doc. 32 at 14. Defendant cites the record to show that other employees, "including male employees and employees of different races and natural origins, were similarly asked to train Tong and/or other new employees on tasks related to their work areas." Doc. 27-4 at 3 (Moberg Aff. ¶ 5). And plaintiff never disputes that other employees experienced similar treatment during training periods. *See* Doc. 32 at 6 (identifying paragraph 21 as controverted but never suggesting that Moberg treated other employees differently in the training context). And so, plaintiff offers no similarly-situated-employee or preferential-treatment bases for an inference of discrimination. Nor do plaintiff's cites to the record—which again include only her own deposition testimony—identify any other basis to infer discrimination. *Id.* (citing Doc. 32-3 at 13–14 (Cordova Dep. 104:15–105:9) (explaining how Moberg reassigned units and why that could prove problematic for plaintiff's hours, but never comparing that reassignment with other employees' training experiences)). Plus, plaintiff never identifies any Moberg actions or remarks in the training context that suggest discriminatory animus. *See generally id.* So, plaintiff's discrimination claim premised on reassignment of duties during training fails to survive summary judgment on this prima-facie-case prong, too. No reasonable jury could infer from the simple reassignment of units, without more, that Moberg acted out of sexual, racial, or national origin discrimination.

        **c.**      **Moberg's delay when providing a workstation safety platform doesn't raise an inference of discrimination.**

Finally, plaintiff contends that Moberg originally acquired the workstation platform he gave to plaintiff for another employee—Christina Savella—not for plaintiff. Doc. 24 at 5–6 (Pretrial Order ¶ 3.a.). She alleges this manifests Moberg's discriminatory behavior because he treated her differently than others. *See id.* at 6. Plaintiff supports this contention—that Moberg ordered the platform for another employee originally—solely with her own deposition testimony, once again. *See* Doc. 32 at 6 (citing Doc. 32-2 at 10–11 (Cordova Dep. 91:14–93:16)). Recall the now oft-repeated refrain of this Order: "Unsupported conclusory allegations . . . do not create a genuine issue of fact." *In re Grandote Country Club*, 252 F.3d at 1149. The unsubstantiated nature of this purchased-for-another employee allegation suffices—by itself—to wipe out plaintiff's claim at summary judgment. But even were the court to accept this unsubstantiated allegation—it doesn't—the purchased-for-another allegation wouldn't raise an inference of discrimination.

*First*, to the extent plaintiff intended to invoke a similarly-situated-employee method of raising an inference of discrimination, she falls short. "Employees are similarly situated when they share a supervisor or decision-maker, must follow the same standards, and engage in comparable conduct." *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021) (first citing *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 540 (10th Cir. 2014), and then citing *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007)). Here, plaintiff never mentions—much less establishes—that Savella is a similarly situated employee. Plaintiff never identifies Ms. Savella's supervisor, nor does she clarify whether she and Ms. Savella must follow the same standards and engage in comparable conduct.

*Second*, to the extent plaintiff intended to rely on preferential treatment of employees outside the protected class, that approach also misses the mark. Plaintiff never identifies

Savella's race, national origin, or sex. So, the court can't ascertain whether Savella, in fact, rests outside the protected class. *See Plotke*, 405 F.3d at 1101. In short, plaintiff has provided no evidence from which a reasonable jury could infer that ordering the platform originally for Savella arose from discrimination—whether based on race, sex, or national origin.

### 2.    Discrimination Conclusion

Plaintiff thus has failed to adduce evidence sufficient to demonstrate defendant took any adverse employment action against her. And even if she had adduced such evidence, plaintiff also hasn't adduced evidence that would allow a reasonable juror to infer discrimination. Plaintiff thus hasn't made out a prima facie case for discrimination. That is, she hasn't adduced sufficient evidence to meet either the second or third prongs of a prima facie discrimination case. *See Ford*, 45 F.4th at 1215 (identifying three requisite prongs for prima facie discrimination case). And so, the court grants summary judgment in defendant's favor against plaintiff's discrimination claim.

The court now turns to the final prong of a prima facie retaliation case: causal connection.

### 3.    Causal Connection

Recall that retaliation claims require the plaintiff to show "'that a causal connection existed between the protected activity and the materially adverse action.'" *Bekkem*, 915 F.3d at 1267 (quoting *Khalik*, 671 F.3d at 1193). Here, that means plaintiff must show that Moberg took action against plaintiff—by monitoring, questioning, reassigning duties, or not providing a workspace solution—out of a desire to retaliate for plaintiff's complaints to KHRC. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). "As a prerequisite to this showing, [plaintiff] must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to [act against her] had knowledge of [her] protected

activity." *Id.* "An employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition." *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (emphasis in original). "Plaintiff must therefore point to evidence that those who acted against [her] knew of [her] formal complaints." *Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019). And "bare speculation" of an employer's knowledge about plaintiff's protected opposition just won't do. *Lindsay v. Denver Pub. Schs.*, 88 F.4th 1323, 1328 (10th Cir. 2023). Instead, a plaintiff must provide "'evidence that the decisionmakers *knew* of the protected conduct.'" *Id.* (emphasis in original) (quoting *Singh*, 936 F.3d at 1043).

Plaintiff never adduces any evidence to show the requisite causal connection. *See generally* Doc. 32. Plaintiff's alleged retaliation relies on three acts: Moberg's vigorous questioning/monitoring of plaintiff, Moberg's reassigning of plaintiff's units to Tong, and Moberg's delay in providing plaintiff with a workstation safety platform. *See* Doc. 24 at 4–7 (Pretrial Order ¶ 3.a.) (identifying retaliation in the context of only these three actions). Moberg performed all three acts, so Moberg—as the one who "acted against" her—had to know of plaintiff's protected activity for his actions to qualify as retaliation. *Hinds*, 523 F.3d at 1203. That is, Moberg's knowledge functions as a "prerequisite" to plaintiff's retaliation claim. *Id.* But plaintiff never adduces any evidence that Moberg knew about her KHRC complaints. In fact, she never alludes to Moberg's knowledge of her KHRC complaints at all—whether with or without supporting evidence from the record. To be sure, both parties have stipulated that plaintiff made those complaints. Doc. 24 at 3 (Pretrial Order ¶ 2.a.xi., Stipulations). But leaning into that stipulation to assume Moberg's knowledge requires the court to speculate—and Circuit precedent forbids such "bare speculation." *Lindsay*, 88 F.4th at 1328. So, the court's analysis

stops here.  Plaintiff hasn't adduced evidence of the requisite causal connection for a retaliation claim, so no reasonable jury could conclude that Moberg's knowledge of plaintiff's protected action caused Moberg's allegedly retaliatory acts.

### 4.  Retaliation Conclusion

As with plaintiff's discrimination claims, plaintiff's retaliation claims fail at both the second and third prima facie prongs.  Plaintiff hasn't adduced sufficient evidence of a materially adverse action to support a retaliation claim.  And even if she had, she hasn't established the prerequisite knowledge required to demonstrate a causal connection between any materially adverse action and her protected activity.  The court thus grants summary judgment to defendant on plaintiff's retaliation claims, as well.

## V.      Legitimate, Non-Discriminatory Reasons and Pretext

The court needn't proceed to the last two prongs of the *McDonnell Douglas* analysis. Our Circuit, when "analyzing discrimination and retaliation claims on summary judgment, . . . has not infrequently dismissed such claims for failure to establish a prima facie case." *Hinds*, 523 F.3d at 1202 n.12.  And while our Circuit "readily concede[s] that the prima facie case requirement may sometimes prove a sideshow to the main action of pretext," it also notes the propriety of deciding some cases on *McDonnell Douglas*'s first prong. *Id.*  Indeed, "if an employee fails to present even the limited quantum of evidence necessary to raise a prima facie" case, the Circuit has found it "pointless to go through the motions of the remainder of the *McDonnell Douglas* framework[.]" *Id.*  Aiming to avoid pointless work, the court stops short of the last two *McDonnell Douglas* prongs.  To review, plaintiff's discrimination and retaliation claims don't survive the prima facie case analysis, so the court grants summary judgment to defendant on these claims.  The court addresses plaintiff's final claim—her hostile work environment claim—next.

VI.        Harassment / Hostile Work Environment Claims

In addition to prohibiting "discrimination with respect to employment decisions that have direct economic consequences," Title VII also "prohibits the creation of a hostile work environment." *Vance v. Ball State Univ.*, 570 U.S. 421, 426–27 (2013).  In such cases, "the plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Id.* at 427 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Assuming a plaintiff proves such pervasive discrimination, an employer may face liability. *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 737 (10th Cir. 2014).

Section 1981 prohibits racial discrimination in the workplace. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015).  And, like Title VII, § 1981 "authorize[s] a plaintiff to bring a claim for hostile work environment based on unlawful" discrimination. *Id.*  "The same substantive standards apply to a hostile work environment claim regardless of whether the plaintiff has brought it under § 1981 or Title VII." *Id.*

"A plaintiff may not predicate a hostile work environment claim on 'the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces.'" *Id.* (quoting *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012)).  Instead, to "defeat summary judgment, there must be evidence from which a jury could find (1) that [plaintiff's] workplace was 'permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment,' and (2) that [she] 'was targeted for harassment because of [her] race' or other protected characteristics." *Rodriguez v. DeJoy*, No. 24-6014, 2025 WL 100723, at *5 (10th Cir. Jan. 15, 2025) (ellipses and second brackets in original) (quoting *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007)).  A plaintiff also must "show that the

environment was both objectively and subjectively hostile or abusive." *Morris v. City of Colorado Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (quotation cleaned up).

Here, plaintiff premises her hostile work environment claim on the three acts by her supervisor addressed above—Moberg's allegedly excessive questioning and monitoring of plaintiff, Moberg's reassigning plaintiff's units during training, and Moberg's delay when providing a safe workstation platform. Doc. 24 at 4, 6–7 (Pretrial Order ¶ 3.a.). She adds another incident involving Moberg—one where he allegedly commented about plaintiff "posing" on her workstation platform and winked at her. *Id.* at 6 (Pretrial Order ¶ 3.a.). And she includes two incidents by coworkers: (1) a female coworker accessing plaintiff's personal information and asking plaintiff "probing questions;" and (2) a female coworker saying, "f***ing bitch" followed by another coworker laughing as they walked past plaintiff on the way to the restroom. *Id.* at 4–5 (Pretrial Order ¶ 3.a.)

The standard for a hostile work environment claim varies depending on whether the alleged harasser is a supervisor or a coworker. *See Vance*, 570 U.S. at 427–28 (explaining different standards for unlawful coworker harassment versus unlawful supervisor harassment). Plaintiff here alleges both supervisor and coworker harassment, so the court explains the two different standards, next.

### A.    Supervisor vs. Coworker Harassment

Many cases begin a Title VII employer liability analysis by deciding this threshold question: did the alleged harasser qualify as a supervisor? *See, e.g.*, *Kramer*, 743 F.3d at 737–43 (conducting extended analysis whether alleged harasser had "power to recommend and influence tangible employment actions"); *Isberner v. Walmart Inc.*, No. 20-2001-JAR-KGG, 2021 WL 4284540, at *21 (D. Kan. Sept. 21, 2021) (concluding supervisory authority inhered where alleged harasser possessed power to discipline plaintiff-employee, weighed in on tangible

employment actions, and contributed to performance evaluations affecting plaintiff-employee's pay). And this approach makes sense. The Supreme Court has identified that, under Title VII, "an employer's liability for [workplace] harassment may depend on the status of the harasser." *Vance*, 570 U.S. at 424. When the harasser qualifies as a coworker instead of a supervisor, "the employer is liable only if it was negligent in controlling working conditions." *Id.* That is, the harassment of the coworker wasn't "made possible by abuse of supervisory power[,]" *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir. 2011), and so different rules apply, *see Kramer*, 743 F.3d at 737 ("[A]n employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior. . . . If the harasser is a supervisor rather than merely a coworker, however, the employer may be vicariously liable for the conduct, depending on the circumstances."); *Vance*, 570 U.S. at 439 ("Negligence provides the better framework for evaluating an employer's liability when a harassing employee lacks the power to take tangible employment actions.").

The Supreme Court has defined the word "supervisor"—for purposes of vicarious liability under Title VII—to include one who "is empowered by the employer to take tangible employment actions against the victim." *Vance*, 570 U.S. at 450. A tangible employment action is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 429 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). And where a "harasser is empowered to effect significant changes in employment status indirectly through recommendations, performance evaluations, and the like, . . . the harasser may be a 'supervisor' under Title VII." *Kramer*, 743 F.3d at 741.

Here, the parties agree Moberg is plaintiff's supervisor.  *See generally* Doc. 27; Doc. 32. Indeed, they stipulate to it.  Doc. 24 at 2 (Pretrial Order ¶ 2.a.iv., Stipulations).  And the summary judgment evidence indicates his title and job position placed him in a so-called supervisory role.  *See* Doc. 27-1 at 2 (Def. Ex. 1) (outlining expectations of "VSL"—Moberg's job title—to include supervising team members, assigning them to production operations, and realigning assignments); Doc. 27-2 at 2–3 (White Aff. ¶ 4) (outlining same VSL duties and identifying Moberg as plaintiff's supervisor).  The court questions whether the outlined VSL duties indeed impute to Moberg the power to take tangible employment actions against plaintiff. *See, e.g.*, *McCafferty v. Preiss Enters., Inc.*, 534 F. App'x 726, 731 (10th Cir. 2013) (explaining that the "power to direct the day-to-day assignments of crew members"—without the power to hire, fire, promote, demote, or transfer employees—doesn't establish supervisory status); *Chavez-Acosta v. Sw. Cheese Co.*, 610 F. App'x 722, 730 (10th Cir. 2015) (holding that one's position as "a part of the 'supervisory hierarchy'. . . is not enough" for supervisory status when one's duties don't provide the "authority to take any 'tangible employment actions'").  But since the parties don't address the issue, the court follows their lead and assumes—without deciding— that Moberg qualifies as a supervisor.  The parties also don't dispute that coworkers—not supervisors—perpetrated the alleged personal information access and "bitch" comment infractions.  *See generally* Doc. 27; Doc. 32.  And so, the court divides its analysis below to align with these different supervisor and coworker harassment standards, starting with the coworkers' alleged harassment.

### B.    Coworker Harassment and the Negligence Standard

According to the Tenth Circuit, there are three situations where an employer may face liability for harassment by its employees:

> (1) where the acts are committed by an employee acting "within the scope of [his or her] employment"; (2) where the employer was negligent or reckless; or (3) where the employee purported to act or to speak on behalf of the employer and there was reliance upon apparent authority, or the harasser was aided by the agency relation.

*Apo-Owusu v. Univ. of Colo. Hosp. Auth.*, No. 16-CV-02031-MEH, 2017 WL 4251926, at *10 (D. Colo. Sept. 26, 2017) (quoting *Adler*, 144 F.3d at 672). Plaintiff here never asserts her coworkers were acting within the scope of their employment when they accessed her personal information or called her a "bitch." Nor does plaintiff assert her coworkers purported to act or speak on defendant's behalf. So, the only possible basis for defendant to incur liability based on acts by plaintiff's coworkers is if defendant acted negligently or recklessly.

To prevail on a negligence theory, plaintiff must show that defendant "had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." *Chavez-Acosta*, 610 F. App'x at 730 (internal quotation marks and citation omitted). "Actual knowledge can be demonstrated in most cases where the plaintiff has reported harassment to management-level employees." *Id.* (internal quotation marks and citation omitted). An employer "may discharge its obligation" to respond adequately "by taking appropriate remedial or preventative action." *Adler*, 144 F.3d at 676.

Our Circuit determines appropriateness by "asking whether the remedial and preventative action was reasonably calculated to end the harassment." *Id.* (internal quotation marks and citations omitted). "'A stoppage of harassment shows effectiveness,' which in turn shows that an employer's response was reasonably calculated to end the harassment." *Rithmixay v. AutoZoners, LLC*, No. 21-CV-02332-HLT, 2022 WL 14624987, at *7 (D. Kan. Oct. 25, 2022) (quoting *Adler*, 144 F.3d at 676). "In cases where effectiveness is not readily evidenced by a stoppage," our Circuit considers "the timeliness of the plaintiff's complaint, whether the

41

employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment." *Adler*, 144 F.3d at 676. One example of an appropriate, reasonable response is a "prompt investigation of the allegations[.]" *Id.*

Here, plaintiff alleges two episodes of coworker harassment. *First*, she alleges that coworker Lori Atwood accessed plaintiff's personal information on Atwood's cell phone and showed it to plaintiff on her phone screen. Doc. 24 at 4 (Pretrial Order ¶ 3.a.). Atwood then began asking plaintiff about where she lived. *Id.* Atwood explained that she did so to show plaintiff that plaintiff had unclaimed property on the Kansas State Treasury website. Doc. 32-6 at 24, 42 (Pl. Ex. E). *Second*, plaintiff alleges one coworker said "f*** you, bitch" when passing plaintiff while another coworker laughed aloud. Doc. 32-3 at 7 (Cordova Dep. at 79:14–80:23).

The undisputed facts in the summary judgment record support just one conclusion: both incidents involved coworkers, not supervisors. Atwood, in the past, had served as plaintiff's crew lead. *Id.* (Cordova Dep. 77:2–10). But before the personal information incident, defendant had moved plaintiff to a different crew. *Id.* So, at the time of the incident, Atwood was plaintiff's coworker. *Id.* (Cordova Dep. 77:6–12). The two women involved in the "bitch" incident were also plaintiff's coworkers, possessing no "power to take tangible job action with respect to [plaintiff's] employment[.]" Doc. 27-2 at 5 (White Aff. ¶ 14); Doc. 32-3 at 7–8 (Cordova Dep. 79:8–81:5).

Plaintiff reported both incidents to defendant. *See* Doc. 32-6 at 38–39, 42 (Pl. Ex. E) (showing defendant's hotline transcript about Atwood accessing personal information); Doc. 32-3 at 7 (Cordova Dep. 79:3–21) (recounting that plaintiff reported the "bitch" incident to the weekend foreman who said he would turn it in to his supervisor and to HR). In response, defendant investigated, conducting interviews with the involved persons. *See* Doc. 32-6 at 23–

24 (Pl. Ex. E) (Investigation Summary of Atwood incident); Doc. 32-3 at 7 (Cordova Dep.

79:22–80:4) (describing how plaintiff talked with HR about the "bitch" comment during

defendant's investigation). Defendant determined both allegations were unsubstantiated. Doc.

32-6 at 24 (Pl. Ex. E); Doc. 32-3 at 7 (Cordova Dep. 79:22–80:4).

*First*, defendant concluded plaintiff's complaint about Atwood was unsubstantiated

because Atwood's intentions weren't malicious. Doc. 32-6 at 24 (Pl. Ex. E). Atwood merely

told plaintiff about unclaimed property in case plaintiff was unaware of it. *Id.* Plus, "the Kansas

State Treasury is a public website that anyone can access." *Id.* *Second*, defendant concluded the

"bitch" incident was unsubstantiated because the involved parties provided conflicting reports

and there weren't any witnesses. Doc. 27-2 at 4 (White Aff. ¶ 13). "Both the coworker who

allegedly made the comment and the purported witness to the event said that it did not occur[.]"

*Id.* Even so, the parties stipulate that defendant engaged in a "level set" conversation with

plaintiff and both coworkers. Doc. 24 at 2 (Pretrial Order ¶ 2.a.vii., Stipulations). That is, in

response to plaintiff's allegation—even though deemed unsubstantiated—defendant reiterated its

professionalism in the workplace standards to the three coworkers involved. *Id.*

No reasonable jury could find defendant's responses failed to satisfy the "reasonably

calculated to end the harassment" metric. *Adler*, 144 F.3d at 676. Take the Atwood incident

first. Plaintiff never alleges any subsequent harassment by Atwood. *See generally* Doc. 24;

Doc. 32. Such "stoppage of harassment shows effectiveness[.]" *Rithmixay*, 2022 WL 14624987,

at *7 (internal quotation marks and citation omitted). And, even if it hadn't, a reasonable jury

only could find that defendant investigated in a timely manner—interviewing Atwood and

plaintiff less than two weeks after plaintiff filed her report—also establishing reasonableness.

*See* Doc. 32-6 at 23 (showing report filed 1/14/22 and Atwood and plaintiff interviewed 1/26/22); *see also Adler*, 144 F.3d at 676.

As for the "bitch" incident, the record doesn't indicate such a stoppage.[7]  *See, e.g.*, Doc. 32-3 at 8–9 (Cordova Dep. 82:16–87:24) (recounting numerous instances of derogatory language use by same coworkers).  But even without a stoppage, a defendant's "remedial and preventative action" may satisfy *Adler*'s "reasonably calculated to end the harassment" standard.  144 F.3d at 676.  For instance, *Adler* identifies a "prompt investigation of the allegations" as a reasonable employer response.  Here, defendant investigated the incident in the same month as plaintiff reported it.[8]  Doc. 24 at 2 (Pretrial Order ¶ 2.a.vii., Stipulations).  No reasonable jury could conclude that an employer's investigation conducted during the same month as the report of harassment wasn't prompt.  *Adler* also suggests considering "whether the response was proportional" to the alleged offense.  144 F.3d at 676.  Here, defendant deemed the incident unsubstantiated but nonetheless convened a conversation with the persons involved about

---

[7]    The parties dispute how the court should view plaintiff's allegations about later derogatory language incidents.  Plaintiff points to HR's alleged promise that "if her claims were substantiated at any point following the initial incident, then the involved parties would receive [a] reprimand for previously reported claims that were previously unsubstantiated."  Doc. 32 at 9.  Plaintiff implies that defendant's alleged failure to reprimand after repeated later incidents should shift the court's analysis of defendant's initial response.  *Id.*  But even without stoppage of harassment, an employer's response may qualify as reasonable.  *Adler*, 144 F.3d at 676.  What's more, plaintiff never supports HR's alleged promise—and defendant's alleged failure to reprimand—with any admissible evidence.  *See* Doc. 32-3 at 9 (Cordova Dep. 86:17–87:17) (explaining HR told plaintiff her derogatory language claim was unsubstantiated and provided a phone number to text about future incidents, but never promising future reprimand or referencing the absence of it).  And plaintiff didn't assert claims premised on these later alleged incidents in the Pretrial Order.  *See Fulcher v. City of Wichita*, 387 F. App'x 861, 862 n.1 (10th Cir. 2010) ("At summary judgment, the district court properly limited the plaintiffs to those claims included in the pre-trial order." (citing *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006))).  So, the court considers these later incidents only to the extent they demonstrate absence of stoppage.

[8]    The precise timing of defendant's investigation isn't clear on the summary judgment record.  But the stipulated facts about this incident begin "[i]n January 2022[.]"  *See* Doc. 24 at 2 (Pretrial Order ¶ 2.a.vii., Stipulations).  And those stipulated facts never reference a subsequent timeframe.  So, the court assumes plaintiff's report, defendant's investigation, and defendant's "level set[ting]" conversation all occurred in January 2022.

professionalism in the workplace.  Doc. 24 at 2 (Pretrial Order ¶ 2.a.vii., Stipulations).  No reasonable jury could find a conversation seeking "to set expectations for proper workplace conduct and standards of professionalism," Doc. 27-2 at 4 (White Aff. ¶ 13), fails as a proportional response to the use of a derogatory phrase.  This is particularly true when the employer's investigation didn't substantiate the derogatory language allegation.

But just in case, imagine the court got it wrong—that is, a reasonable jury could find defendant failed to satisfy the "reasonably calculated to end" standard.  The court still would grant summary judgment because these allegations also can't traverse the severity or pervasiveness thresholds required to present a triable hostile work environment claim.  The court explains this reasoning, next.

### C.    Severity or Pervasiveness Analysis

To survive summary judgment on either her supervisory or coworker harassment claims, plaintiff must show that a reasonable jury could find the alleged harassment "sufficiently pervasive or severe to alter the conditions of employment."  *Pfannenstiel v. Kansas*, No. 23-3145, 2024 WL 3534142, at *4 (10th Cir. 2024) (quotation cleaned up).  "This standard sets a high bar for plaintiffs in order to distinguish meaningful instances of discrimination from instances of simple disrespect."  *Id.* (quotation cleaned up).  The court thus rounds out this Order with a severity and pervasiveness analysis, next.

But first, as an important preliminary matter, recall that plaintiff must "show that the environment was both objectively and subjectively hostile or abusive."  *Morris*, 666 F.3d at 664 (quotation cleaned up).  Neither party disputes whether plaintiff experienced her environment as hostile.  So, for purposes of this Order, the court assumes plaintiff subjectively experienced a hostile or abusive environment.  The court thus focuses its severe or pervasive analysis solely on the objective prong of the standard.

### D. Sufficiently Severe or Pervasive

"Proof of either severity or pervasiveness can serve as an independent ground to sustain a hostile work environment claim." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021) (citation omitted). To make the severity or pervasiveness determination, a court must evaluate the totality of the circumstances. *Id.* This means the court must "'consider such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Morris*, 666 F.3d at 664). A plaintiff doesn't demonstrate a sufficiently pervasive or severe hostile work environment with "a few isolated incidents" unless those "isolated incidents are in themselves 'severe.'" *Morris*, 666 F.3d at 666. That is, although "there is no talismanic number of incidents needed to give rise to a hostile discrimination claim, a plaintiff ordinarily must show more than a few isolated incidents of enmity on the basis of the protected status to establish a hostile work environment." *Iweha v. Kansas*, 121 F.4th 1208, 1223 (10th Cir. 2024) (quotation cleaned up). Thus, "even sporadic slurs are insufficient; there must be a steady barrage of opprobrious comments based on race[, sex,] or national origin." *Id.* (quotation cleaned up). Where a plaintiff hasn't "identified any explicit discriminatory slurs—much less a quantity of them that would be deemed more than sporadic or isolated . . . . her hostile work environment claim comes up far short." *Id.* "[W]hether the conduct was severe or pervasive is typically a question for the jury," but granting summary judgment is appropriate when "the plaintiff fails to make" a severe or pervasiveness showing. *Throupe*, 988 F.3d at 1252.

The court first examines whether a reasonable jury could conclude that plaintiff experienced severe harassment from either her coworkers or her supervisor.

### 1. Severity in the Case Law

Our Circuit has found "conduct sufficiently severe to overcome summary judgment in only particularly threatening or humiliating circumstances." *Throupe*, 988 F.3d at 1255. *Throupe* is instructive here. 988 F.3d 1243. There, plaintiff was an associate professor of real estate at the University of Denver when he developed a close personal and professional relationship with a female graduate student from China. *Id.* at 1248. According to plaintiff, his superiors spread rumors about his relationship with this student; required him to undergo a Title IX investigation; issued a written warning instructing him not to interact with this student or others in a similar manner; assigned him an unfavorable teaching schedule with less desirable class assignments; and yelled at him once during a scheduled meeting. *Id.* at 1253. Among other issues on appeal, our Circuit considered whether the district court properly had granted summary judgment against the professor's hostile work environment claim. In a nutshell, the district court reasoned that no reasonable jury could find the alleged treatment sufficiently severe or pervasive to support a hostile work environment claim. *Id.* at 1255. Our Circuit recognized that the defendants' actions likely were "personally painful" for plaintiff. *Id.* Nonetheless, it agreed with the district court. The conduct didn't rise to the level of severity required for a hostile work environment claim to survive summary judgment because the conduct was neither threatening nor humiliating. *Id.* And so, it affirmed summary judgment for defendants.

Our Circuit likewise has affirmed other similar rulings granting summary judgment, concluding plaintiff's evidence inadequate to present a triable issue on the severe or pervasive requirement. Take *Morris* as an example. There, a registered nurse alleged that a surgeon flicked her on the head twice and threw pericardium tissue at her during a surgical procedure— soaking her scrubs with blood and bodily fluids. 666 F.3d at 665. He also generally yelled at her and demeaned her work with comments like "get your ass in gear" or "get someone in here who

knows what they are doing." *Id.* at 665–66.  Our Circuit nonetheless affirmed summary judgment against the nurse's hostile work environment claim, holding that these isolated incidents didn't rise to a sufficient level of severity to present a triable hostile work environment claim because they "could not reasonably be viewed as threatening or severe." *Id.* at 668.  It also concluded that the surgeon's "'slurs'" didn't rise to the "'steady barrage of opprobrious . . . comments'" necessary to survive summary judgment.  *Id.* at 666 (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005)).

By contrast, the Tenth Circuit has held the hostile work environment in *Sanderson v. Wyoming Highway Patrol* sufficiently severe and pervasive to preclude summary judgment.  976 F.3d 1164, 1177 (10th Cir. 2020).  There, a female employee "was subjected to persistent, repeated rumors of sexual promiscuity. . . . [that] characterized [her] as having a sexual relationship with colleagues and various supervisors[.]" *Id.*  Those colleagues "speculated that she used sex to gain advantages, including securing her [employment] position[.]" *Id.*  She endured collocations like the "division bicycle" and faced rumors that she "used sex to obtain a new patrol car." *Id.* at 1174.  Holding the hostile environment sufficiently severe and pervasive, our Circuit emphasized that the "rumors were circulated by *multiple* colleagues; they *were not isolated comments made by a particular supervisor*[.]" *Id.* (emphasis added).  Finally—in two other cases our Circuit has determined one episode of sexual assault (even when singular and isolated) so "especially egregious or extreme" that it "could be objectively viewed as threatening and severe." *Morris*, 666 F.3d at 667 (first citing *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238 (10th Cir. 2001); and then citing *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998)).  The insufficiently severe conduct in *Throupe* and *Morris* and the sufficiently severe conduct in *Sanderson*, *Turnbull*, and *Lockard* allow the court to extrapolate a severity continuum.  The court

locates defendant's conduct here on that continuum, below, and explains its reasons for that placement.

### 2.    Severity Analysis

Plaintiff's grievances were neither physically threatening nor objectively humiliating. *See Throupe*, 988 F.3d at 1252. When our Circuit explains severity, it contrasts physically threatening or humiliating behavior with "'a mere offensive utterance.'" *Throupe*, 988 F.3d at 1252 (quoting *Morris*, 666 F.3d at 664). Here, neither of the coworker incidents involved an objective physical threat. Perhaps plaintiff subjectively experienced Atwood's questions about her place of residence as portending a future physical threat—though the leap from residence location to future physical threat isn't a small one. Viewed objectively, Atwood's showing plaintiff personal information publicly available on a state government website doesn't rise to the level of severe harassment. Nor does the "bitch" incident. Of course, addressing someone as a "f***ing bitch" is offensive. But those words place the comment in the category of "a mere offensive utterance," not physically threatening or humiliating. Neither of plaintiff's coworker grievances thus surpass the severity threshold.

Nor do plaintiff's supervisor grievances. Recall that plaintiff replays the three supervisor grievances from her discrimination and retaliation claims to support her harassment claim: excessive questioning/monitoring; reassigning duties; and delay in providing her workstation safety platform. Plaintiff also adds one more grievance: Moberg's "posing" comment. Moberg and two other individuals were measuring plaintiff's workstation for her new platform when Moberg allegedly made the following statement and then winked at plaintiff: "Yes, I have seen [plaintiff] almost slip from the box as she was posing. She can pose on the stepstool even better than before[.]" Doc. 32-3 at 12 (Cordova Dep. 98:17–100:4). Two witnesses deny and one witness confirms the statement. Doc. 27-2 at 3 (White Aff. ¶ 9).

Drawing all inferences in favor of plaintiff—as it must—the court assumes Moberg made the comment and followed it with a wink. Even so, none of these four actions surpass the severity threshold. None involve a physical threat. Nor do they meet the humiliating criterion. Perhaps plaintiff experienced subjective embarrassment when Moberg asked her frequent questions or reassigned her duties because such actions suggested she wasn't performing well at her job. But our Circuit has found similar demeaning comments about one's job performance less than severe. *See Morris*, 666 F.3d at 665–66 (finding not severe a supervisor's demeaning comments including "get your ass in gear" and "get someone in here who knows what they are doing"). And, compared to the comments in *Sanderson* about an employee's sexual promiscuity, the isolated "posing" comment here lands easily on the merely offensive end of the severity spectrum. No reasonable jury could find any of plaintiff's supervisor grievances sufficiently severe to support a hostile work environment claim. This conclusion leaves only the issue of pervasiveness.

### 3.    Pervasiveness in the Case Law

The coworker and supervisor conduct plaintiff here has adduced also doesn't raise a triable issue of pervasiveness. According to our Circuit, "a few isolated incidents" of discriminatory conduct doesn't make harassment pervasive. *Id.* at 666 (internal quotation marks and citation omitted). Instead, a pervasively hostile environment is one "*polluted* with gender-specific comments and behavior," *id.* (emphasis in original) (quotation cleaned up), and "*permeated* with discriminatory intimidation, ridicule, and insult," *Ford*, 45 F.4th at 1228 (emphasis added) (quotation cleaned up). Courts assess pervasiveness by examining the number of offending incidents and comparing it to the length of time over which they occurred. *See, e.g.*, *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (holding "five separate incidents . . . over a span of approximately sixteen months" insufficiently severe or pervasive to

survive summary judgment); *Chavez*, 397 F.3d at 833–34 (identifying that plaintiffs had endured "a number of gender-based incidents" over a year's time); *Morris*, 666 F.3d at 665, 669 (noting the incidents alleged by plaintiff were "relatively isolated" when compared with plaintiff's "otherwise uneventful tenure" on the surgical heart team). Assessing pervasiveness also requires the court to consider the extent to which the offending behavior spread. *See Sanderson*, 976 F.3d at 1177 (contrasting "isolated comments made by a particular supervisor" with rumors "circulated by multiple colleagues" to conclude a jury could find severe or pervasive harassment); *see also Frank v. Heartland Rehab. Hosp., LLC*, No. 20-CV-2496-HLT-KGG, 2022 WL 486793, at *5 (D. Kan. Feb. 17, 2022) (citing *Sanderson* and holding that allegedly harassing "behavior by a single employee . . . pales in comparison" to "humiliating rumors by multiple colleagues in multiple divisions"), *aff'd*, No. 22-3031, 2023 WL 4444655 (10th Cir. July 11, 2023).

*Ford v. Jackson National Life Insurance* provides further direction for the court's pervasiveness analysis. 45 F.4th 1202. There, male co-workers repeatedly asked plaintiff sexually explicit questions and made sexist remarks "on a daily basis with impunity." *Id.* at 1230. Other female employees confirmed the constant nature of degrading "sexual banter." *Id.* Indeed, sexually explicit conversations occurred so frequently that "one employee said, 'it would be easier to list the employees who didn't participate than the ones who did.'" *Id.* (quotation cleaned up). On these facts, our Circuit held that "a reasonable jury could find that [defendant] maintained a work environment that was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Id.* (internal quotation marks and citation omitted). Guided by these cases, the court examines whether a reasonable jury could find that this plaintiff experienced pervasive harassment.

### 4.      Pervasiveness Analysis

Here, plaintiff's grievances consist primarily of one-off isolated incidents.[9]  These one-off events—even taken together, as the totality of the circumstances analysis requires—don't add up to the kind of repeated, constant, frequent behavior that our Circuit found pervasive in *Ford*. 45 F.4th at 1230–31.  The only behavior plaintiff alleges as repetitive is Moberg's allegedly excessive questioning/monitoring and his thrice-repeated transfer of units from plaintiff to Tong. Plaintiff never adduces evidence to indicate how often this questioning/monitoring allegedly took place, hindering the court's ability to conduct a pervasiveness analysis.  Even so, repeated questioning/monitoring that aligns with a supervisor's job description and relates only to plaintiff's job duties doesn't create an environment "'*permeated* with discriminatory intimidation, ridicule, and insult.'"  *Id.* at 1228 (emphasis added) (quoting *Throupe*, 988 F.3d at 1252).  Plaintiff never adduces evidence to show that Moberg—when he questioned her about completion dates—made, for example, "gender-specific comments" (or race or national origin-specific comments, either).  *Morris*, 666 F.3d at 666.  Nor is there evidence of degrading "sexual banter" (or degrading race or national origin banter, either).  *Ford*, 45 F.4th at 1230.  Similarly, plaintiff never adduces evidence of comments or banter accompanying the thrice-repeated shifting duties.  Plaintiff's assertions simply don't align with the operative phrases that describe pervasiveness:  a "polluted" hostile environment, *Morris*, 666 F.3d at 666, "permeated with discriminatory intimidation, ridicule, and insult," *Ford*, 45 F.4th at 1228.

When the analysis reaches the other incidents, each involved only "isolated comments." *Sanderson*, 976 F.3d at 1177.  Plaintiff never alleges anything analogous to rumors "circulated

---

[9]      As noted already, the Pretrial Order only asserts one episode of coworker using demeaning language.  *See* note 7.  And so, in conducting its pervasiveness analysis, the court considers only that one episode.

by multiple colleagues"—a distinction our Circuit deemed significant to the pervasiveness analysis in *Sanderson*. *Id.* Nor does plaintiff adduce evidence from which a jury could find these isolated incidents were perpetrated by more than "a single employee." *Frank*, 2022 WL 486793, at *5. At bottom, plaintiff hasn't adduced evidence that would allow a reasonable jury to find pervasiveness.

The court is mindful that it mustn't snatch a jury question out of the jury's hands. And the court acknowledges that determining severity or pervasiveness often rests with the jury. *See Sanderson*, 976 F.3d at 1176 ("The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." (quotation cleaned up)). This language appears to suggest that summary judgment on a severity or pervasiveness analysis is not often appropriate. But the Circuit's cases firmly establish that summary judgment—in the right circumstances—remains appropriate. Our Circuit often has affirmed summary judgment premised on insufficient severity or pervasiveness, as the cases surveyed above demonstrate. The court strives to follow and apply the contours of those summary judgment rulings. Together they permit the court to extrapolate a severity and pervasiveness continuum. That is, looking at a composite of a plaintiff's allegations, the court divides the (relatively speaking) innocuous work environments—think *Throupe* and *Morris*—from those more shameful—think *Sanderson* and *Ford*. When the court compare this case's summary judgment facts alongside these rulings, plaintiff's allegations belong with the cases where our Circuit affirmed summary judgment.

Remember, not "all offensive or hurtful conduct within the workplace is actionable under Title VII[.]" *Throupe*, 988 F.3d at 1255. Even drawing all inferences from the summary judgment evidence to favor plaintiff, the court concludes plaintiff has failed to make a showing

sufficient to survive summary judgment on her harassment claim. So, the court grants summary judgment for defendant on this claim, as well.

## VII.    Conclusion

Plaintiff fails to adduce evidence sufficient to show the requisite adversity for her discrimination and retaliation claims. She also fails to adduce evidence that raises an inference of discrimination or creates a causal connection that would support prima facie cases of discrimination or retaliation. And so, the court grants summary judgment to defendant against plaintiff's claims for sex, race, and national origin-based discrimination and retaliation. Plaintiff also fails to create a triable issue about defendant's negligence, as required for liability for coworker harassment. And even if she had met that mark, neither the alleged coworker harassment nor the alleged supervisor harassment rises to the level of severity or pervasiveness required for a triable hostile work environment claim. The court thus grants summary judgment to defendant against this claim as well.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Textron Aviation, Inc.'s Motion for Summary Judgment (Doc. 26) is granted. And this case is closed.

**IT IS SO ORDERED.**

**Dated this 30th day of April, 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
